**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In Re:

350 ENCINITAS INVESTMENTS, LLC,

Debtor.

---

BARRY J. STONE, and GAS PLUS, a California Corporation,

Appellants,

v.

350 ENCINITAS INVESTMENTS, LLC,

Appellee.

---

Civil No. 06cv2085 WQH (POR)

Bankruptcy No. 01-01059-A11

**ORDER**

HAYES, Judge:

The matter before the Court is the appeal of the Bankruptcy Court's "Orders (1) Overruling Objections to Proposed Settlement; and (2) Authorizing Reorganized Debtor to Enter into and Consummate Settlement Agreement," issued on September 12, 2006.

**I. Background**

On February 2, 2001, 350 Encinitas Investments, LLC ("Appellee" or "Debtor") filed its Voluntary Petition for reorganization under Chapter 11 of the United States Bankruptcy Code. (Appellee's Supplemental Designation of Items to Be Included in Record on Appeal ("Appellee's ROA") 1.1.) The case was filed in the United States Bankruptcy Court for the Southern District of California and assigned case number 01-01059-A11. (*Id.*)

While the Petition was pending, the Debtor's service station and convenience store business was sold to Satinder Uppal. This transaction was confirmed by the Bankruptcy Court on October 3, 2001. (Appellants' Record on Appeal ("Appellants' ROA") 10 at 2.)

On June 30, 2003, the First Amended Plan of Bankruptcy Reorganization (the "Plan") was approved by the Bankruptcy Court. (Appellants' ROA 2 at 1-3.) The Plan appointed Edward Z. Estrin as the "Responsible Person" and the "Disbursing Agent." (*Id.*, Ex. A at 4, 7.) According to the Plan, "'Responsible Person' means . . . Edward Z. Estrin, CPA, or such other person as the Bankruptcy Court shall appoint to be responsible for the Debtor's performance under the Plan from and after the Confirmation Date." (*Id.*, Ex. A at 7.) "'Disbursing Agent' means Edward Z. Estrin, CPA, or such other Person appointed by the Bankruptcy Court to make certain of the Distributions pursuant to the terms of the Plan." (*Id.*, Ex. A at 4.) Appellants' projections showed that it would take 20 years to pay off the creditors. (Appellee ROA 1.21, Ex. A.)

The Plan further provides: "From and after the Confirmation Date, the Debtor shall have the right to enforce, prosecute, file, collect, settle or resolve any Causes of Action." (Appellants' ROA 2, Ex. A at 21.) "Causes of Action" is defined as "all rights exercisable by the Debtor as Debtor-in-Possession pursuant to Bankruptcy Code Sections 506, 510, 544, 547, 548, 549, 550 and 553."[1] (*Id.*, Ex. A at 3.) The Plan also provides that "[t]he Debtor shall

---

[1] Bankruptcy Code Sections 506, 510, 544, 547, 548, 549, 550 and 553 relate to determining the amount of a secured claim, subordinating claims and the exercise of a debtor's avoidance powers. *See* 11 U.S.C. §§ 506 (determination of secured status), 510 (subordination), 544 (trustee as lien creditor and successor to certain creditors and purchasers), 547 (preferences), 548 (fraudulent transfers), 549 (postpetition transactions), 550 (liability of transferee of avoided transfer) & 553 (setoff).

have the right to file, prosecute, litigate or settle any objections to Claims. . . ." (*Id.*, Ex. A at 21.)

On February 9, 2005, the Bankruptcy Case was closed, but remained subject to being reopened pursuant to the Plan's reservation of jurisdiction, which states as follows: "The [Bankruptcy] Court shall retain jurisdiction over the Case subsequent to the Confirmation Date to the fullest extent permitted under Section 1334 of Title 28, United State[s] Code. . . ." (*Id.*, Ex. A at 27; Appellants' ROA 10 at 5.)

On August 1, 2005, Satinder Uppal presented Estrin a claim for damages related to the business Uppal purchased from Debtor in 2001. (Appellants' ROA 13 at 2.) On August 3, 2005, Estrin, acting as Responsible Person for Appellee (i.e., the Reorganized Debtor), rejected the claim. (*Id.* at 3.) On October 10, 2005, Estrin, Uppal, Appellee and Appellants all participated in a formal mediation proceeding in an attempt to resolve the controversies raised by Uppal's claim. (*Id.*) The mediation ended in impasse. (*Id.*)

On October 25, 2005, Uppal filed a complaint against Appellee, Estrin, and Appellants in the Superior Court for the State of California, alleging violations of state law that occurred both before and after the date of Plan confirmation (i.e. June 30, 2003). (*Id.*; Appellants' ROA 3.) Estrin was served with the complaint both as an individual defendant, and on behalf Appellee, as its Responsible Person. (Appellents' ROA 13 at 3-4.) On November 4, 2005, counsel for Appellee, Scott Keehn (who was hired by Estrin) removed Uppal's complaint to Bankruptcy Court. (*Id.* at 4.) On November 25, 2005, on Estrin's authority, Keehn filed a motion to dismiss Uppal's complaint. (*Id.*) This motion was subsequently joined by Estrin (who was representing himself in the Uppal litigation) and Appellants. (*Id.*; Appellants' ROA 10 at 7-8; Appellee's ROA 2.8.)

On March 8, 2006, the Bankruptcy Court entered an order granting the motions to dismiss with prejudice with respect to all claims related to conduct of Appellee that occurred prior to the date of Plan confirmation (i.e., June 30, 2003). (Appellee's ROA 2.16.) The Bankruptcy Court remanded to state court all remaining claims for post-confirmation conduct. (*Id.*) No appeal was taken from this March 8, 2005 order. (Appellants' ROA 10 at 9.)

On March 16, 2006, Uppal's attorney made a settlement proposal to Appellee, Appellants and Estrin.  (Appellants' ROA 14 ¶ 20, Ex. 19.)

Estrin authorized Keehn to proceed with legal actions necessary to recover from Uppal and/or his attorneys the money expended in responding to the Uppal claims by initiating contempt proceedings for violating the discharge injunction. (Appellants' ROA 13 at 5.)  In response, Uppal "threatened to expand the litigation, both in state court and the bankruptcy court (threatening, among other things, [to] challeng[e] the validity of the Confirmation Order based on [Uppal's] 'lack of notice')."  (*Id.*)

On April 21, 2006, Estrin and Keehn and the attorney representing Appellants conferred regarding a "walk-away settlement" that had been proposed by Uppal's attorney.  (*Id.*)  According to Estrin's affidavit:

> Although I personally do not believe that Uppal . . . would ever succeed in any of [his] claims–expanded or otherwise–I was, and remain concerned that the litigation cost of defeating the claims could completely consume every asset available to the Reorganized Debtor, leaving nothing for creditors at the end of the day. . . . I believe that would be true even if we fully recovered all of the costs, expenses, and attorneys fees incurred from the time that the Uppal . . . demands were originally made, through and including the time when the bankruptcy court entered its orders on the Rule 12 Motion.  It was with those thoughts in mind that, when presented with the opportunity to simply end the litigation and its cash drain on the Reorganized Debtor, I concluded that the settlement would be in the long-range best interests on the Reorganized Debtor and its creditors.

(*Id.*)

On April 24, 2006, Appellants' attorney wrote to Keehn communicating Appellants' position that Appellee should not give up any right to recover attorneys fees against Uppal. (Appellants' ROA 14 ¶ 21, Ex. 20.)  On April 24, 2006, Keehn responded by summarizing the arguments in favor of a "walk away settlement."  (*Id.* ¶ 22, Ex. 21.)

On May 8, 2006, Appellants' attorney responded with a letter, stating in part:

> In reviewing the Plan of Reorganization, it appears that Mr. Estrin has no authority to hire counsel on behalf of 350 Encinitas and, consequently, had no authority to pay any money for fees, *even if* those assets were not already committed to pay the preconfirmation creditors of 350 Encinitas as we know they are.  Thus, in addition to refusing to act as required by the charge conferred upon him in the Plan, Mr. Estrin has also acted in excess of the limited ministerial disbursing authority he *did* have.  It also appears that, if any judgement ever resulted from Mr. Uppal's claim, this liability would have gone

> to the end of the line, *after* the disbursements to scheduled creditors required by the Plan were concluded many years hence. . . . Needless to say, under the Plan and the law, Mr. Estrin has no authority to seek the Court's approval of any compromise of the Reorganized Debtor's claims.

(*Id.* ¶ 24, Ex. 23.) This letter is the first time Appellants communicated their position that Estrin did not have authority to hire counsel on behalf of Appellee.

On May 26, 2006, a settlement agreement was executed between Estrin, on behalf of himself and on behalf of Appellee, and Uppal ("Settlement Agreement"). (Appellants' ROA 5, Ex. A.)

On May 31, 2006, Appellee filed and served a Notice of Intended Action ("NOIA") with the Bankruptcy Court, seeking approval of the Settlement Agreement. (Appellants' ROA 5.) The NOIA provides, in part: "The Responsible Person has determined, in the exercise of his business judgment, that the terms of the [Settlement] Agreement, which terminate all proposed litigation in its entirety, is in the best economic interest of the Reorganized Debtor and the estate." (*Id.*) The Settlement Agreement is referenced in, and attached to, the NOIA. According to the Settlement Agreement, one of the claims being settled is the aforementioned contempt action "to recover the approximately $50,000.00 [Appellee] has expended on attorneys' fees and costs incurred by the [Appellee] dealing with, and defending against the Discharged Claims pursued and prosecuted by [Uppal]." (*Id.*, Ex. A at 4.) Another of the claims being settled is summarized in the Settlement Agreement as follows:

> Plaintiffs [i.e., Uppal and his company] have now asserted that the [Appellee] obtained the order confirming its Chapter 11 Plan without having provided the necessary notice to Plaintiffs, that the Confirmation Order was fraudulently obtained, and that Plaintiffs have claims sounding in 'set-off' and 'Recoupment' substantially in excess of the amounts claimed by the [Appellee] to be recoverable as a contempt sanction. Plaintiffs also have disclosed to [Appellee and Estrin] their intention to seek to have the Confirmation Order vacated based upon the alleged fraudulent manner in which it was obtained.

(*Id.*)

The Settlement Agreement also attaches "conditions to finality of this settlement," which include the following:

> 2.1.1 <u>Final Approval of the Bankruptcy Court</u> The Bankruptcy Court acting in the Bankruptcy Case shall have entered an order approving the compromise embodied in this Agreement, and the order has become a final order

> which is no longer subject to appellate review. This condition is imposed for the benefit of both of the 350 Parties [i.e., Appellee and Estrin].
>
> 2.1.2 <u>Final Approval as a 'Good Faith Settlement'</u> The Superior Court acting in the State Court Action shall have entered its order approving the compromise embodied in this Agreement as a *Good Faith Settlement* based on the Plaintiffs' motion made pursuant to California Code of Civil Procedure § 877.6, and served upon all defendants named in the Original Complaint; and, that order has become a final order which is no longer subject to appellate review. This condition is imposed for the benefit of all parties to this Agreement.

(*Id.*, Ex. A at 6 (emphasis in original).)

On July 5, 2006, Appellants filed two declarations, additional evidence and a brief in opposition to the NOIA, arguing that: the Bankruptcy Court did not have jurisdiction to approve the Settlement Agreement; Estrin did not have authority under the Plan to bind Appellee to the Settlement Agreement; Estrin has a conflict of interest; and the Settlement Agreement constitutes "both an illegal Post-Confirmation amendment of the Plan, and an unpalatable one-sided deal whose only 'virtue' is that it protects Estrin from his own mismanagement." (Appellants' ROA 7 at 4; Appellants' ROA 8-9.)

On July 20, 2006, Keehn, on behalf of Appellee, filed three declarations, additional evidence and "Reorganized Debtor's Memorandum of Points and Authorities in Response to Opposition to Settlement Agreement." (Appellants' ROA 10-14.)

On August 31, 2006, the Bankruptcy Court issued a tentative ruling overruling the objection to the Settlement Agreement and stating that "Debtor is authorized to pursue settlement by obtaining state court determination that this is a good faith settlement between the debtor and Uppal, et al." (Appellee's ROA 1.41.) The tentative ruling further states:

> Court has reviewed the lengthy history of this case [see Reorganized Debtor's points and authorities in response to opposition], reviewed terms of confirmed plan of reorganization [especially Sec. 5.6, 5.7, 5.8 and 10.1] and concludes as follows:
>
> 1. Court has jurisdiction to approve this settlement [even though we declined to exercise jurisdiction over the post-confirmation claims asserted in this action] by reason of 28 USC 1334(b) and Section 10.1 of the plan.
>
> 2. Estrin has authority to request this court authorize the settlement. The history of the negotiation of this ultimately consensual plan makes it clear that Estrin was to succeed Barry Stone and Gas Plus in management of the debtor until plan terms had been performed. Given Estrin's extensive participation in the litigation with Uppal–all without protest by Stone/Gas Plus–even if the full extent of Estrin's authority was not entirely clear, Stone/Gas Plus' post-confirmation conduct waives any claim that he is without authority to settle the

litigation.

(*Id.*) After issuing the tentative ruling, the Bankruptcy Court conducted oral argument on the NOIA. (Supplement to Transmittal of Appeal, Doc. # 9.) At the conclusion of oral argument, the Bankruptcy Court stated: "The tentative [ruling] . . . will be approved or confirmed as a final ruling . . . . [T]he Court has looked at the Plan, has looked at the rationale for the litigation, tested it against [*In re*] *AC Properties*[, 784 F.2d 1377 (9th Cir. 1986)], and believes that this settlement is in the best interest of the estate and its creditors and subsequently I will authorize it." (*Id.* at 19-20.)

On September 12, 2006, the Bankruptcy Court issued its "Orders (1) Overruling Objections to Proposed Settlement; and (2) Authorizing Reorganized Debtor to Enter into and Consummate Settlement Agreement" ("September 12, 2006 Order"), wherein the Bankruptcy Court incorporated by reference its tentative ruling and the findings of fact and conclusions of law stated at oral argument. (Appellee's ROA 1.42.) The Bankruptcy Court further stated: "The Objection to the Settlement is overruled in its entirety; and . . . [w]ithout limiting the generality of the foregoing, it is further ordered that the Reorganized Debtor is authorized to make, and consummate, the proposed settlement upon the terms and conditions set forth in the [Settlement Agreement] . . . incorporated herein by this reference." (*Id.*)

On September 22, 2006, Appellants timely filed a Notice of Appeal of the Bankruptcy Court's September 12, 2006 Order. (Doc. # 1.) Appellants elected to have their appeal heard by this Court pursuant to 28 U.S.C. § 158(c)(1)(A). (*Id.*) After receiving briefing from the parties, the Court heard oral argument on June 29, 2007.

## II. Discussion

The issues presented on appeal are: (1) whether the Bankruptcy Court had subject-matter jurisdiction to issue the September 12, 2006 Order; (2) whether the Bankruptcy Court erred in finding that Estrin had the authority to negotiate and enter into the Settlement Agreement on behalf of Appellee, and/or that Appellants waived any claim that Estrin did not have the authority to settle; and (3) whether the Bankruptcy Court erred in approving the Settlement Agreement.

**A. Subject-Matter Jurisdiction**

This Court reviews de novo whether the Bankruptcy Court had subject-matter jurisdiction to issue the September 12, 2006 Order. *See In re Pegasus Gold Corp.*, 394 F.3d 1189, 1193 (9th Cir. 2005); *In re Harris Pine Mills*, 44 F.3d 1431, 1435 (9th Cir. 1995).

"A bankruptcy court's jurisdiction is grounded in and limited by statute. Bankruptcy jurisdiction is initially conferred on district courts, which have original and exclusive jurisdiction over bankruptcy cases as well as original but not exclusive jurisdiction over 'all civil proceedings arising under title 11, or arising in or related to cases under title 11.'" *In re McCowan*, 296 B.R. 1, 2 (9th Cir. BAP 2003) (quoting 28 U.S.C. § 1334(a), (b)) (citation omitted). This Court has provided by rule for automatic reference of bankruptcy cases to bankruptcy court. *See id.* at 2 n.2.

"Bankruptcy courts may hear and determine all bankruptcy cases as well as 'core' proceedings, which are matters that arise under the Bankruptcy Code or arise in a bankruptcy case. The bankruptcy court may determine 'non-core' proceedings, or those 'related to' the bankruptcy case, with the consent of the parties. Otherwise, a 'non-core' proceeding is heard by the bankruptcy court, which makes proposed findings and conclusions for the district court. If bankruptcy jurisdiction does not exist in the district court because the proceeding does not arise under the Bankruptcy Code or arise in a bankruptcy case, or is not related to a bankruptcy case, the bankruptcy court does not have jurisdiction." *Id.* at 3 (citing 28 U.S.C. § 157(b)(1) ("core" proceedings) & 28 U.S.C. § 157(c) ("non-core" proceedings)); *see also In re Harris Pine Mills*, 44 F.3d at 1436. The Ninth Circuit has explained:

> [T]he phrase 'arising under title 11' to describe those proceedings that involve a cause of action created or determined by a statutory provision of title 11 . . . . The meaning of 'arising in' proceedings is less clear, but seems to be a reference to those 'administrative' matters that arise only in bankruptcy cases. In other words, 'arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy. If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding; it may be related to the bankruptcy because of its potential effect, but . . . it is an 'otherwise related' or non-core proceeding. . . . [C]laims that arise under or in Title 11 are deemed to be 'core' proceedings, while claims that are related to Title 11 are 'noncore' proceedings.

*In re Harris Pine Mills*, 44 F.3d at 1435 (quotation omitted).

The Bankruptcy Court in this case stated that it "has jurisdiction to approve this settlement (even though we declined to exercise jurisdiction over the post-confirmation claims asserted in this action) by reason of 28 U.S.C. 1334(b) and Section 10.1 of the plan." (Appellee's ROA 1.41.)

Section 10.1 of the Plan provides: "The Court shall retain jurisdiction over the Case subsequent to the Confirmation Date to the fullest extent permitted under Section 1334 of Title 28, United State[s] Code. . . ." (Appellant's ROA 2 at 27.) "Retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction." *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004) ("If there is no jurisdiction under 28 U.S.C. § 1334 or 28 U.S.C. § 157, retention of jurisdiction provisions in a plan of reorganization or trust agreement are fundamentally irrelevant. But if there is jurisdiction, we will give effect to retention of jurisdiction provisions.").

With respect to pre-confirmation bankruptcy jurisdiction, "[t]he Ninth Circuit has adopted the '*Pacor* test' for determining the scope of 'related to' jurisdiction." *In re Pegasus Gold Corp.*, 394 F.3d at 1193 (citing *In re Fietz*, 852 F.2d 455, 457 (9th Cir. 1988)). Under this formulation, the test is whether:

> *the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy*. Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*In re Fietz*, 852 F.2d at 457 (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (emphasis in original); *see also In re Pegasus Gold Corp.*, 394 F.3d at 1193. With respect to post-confirmation bankruptcy jurisdiction, the Ninth Circuit in *Pegasus Gold Corp.* stated:

> We agree that post-confirmation bankruptcy court jurisdiction is necessarily more limited than pre-confirmation jurisdiction, and that the *Pacor* formulation may be somewhat overbroad in the post-confirmation context. Therefore, we adopt and apply the Third Circuit's 'close nexus' test for post-confirmation 'related to' jurisdiction, because it recognizes the limited nature of post-confirmation jurisdiction but retains a certain flexibility, which can be especially important in cases with continuing trusts.

*In re Pegasus Gold Corp.*, 394 F.3d at 1194 (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004)).  Under the "close nexus" test, "'the essential inquiry appears to be whether there is a close nexus to the bankruptcy plan or proceeding sufficient to uphold bankruptcy court jurisdiction over the matter.'" *Id.* (quoting *In re Resorts Int'l*, 372 F.3d at 166-67). "[M]atters affecting 'the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus.'" *Id.* (quoting *In re Resorts Int'l*, 372 F.3d at 167).

In *Pegasus Gold Corp.*, the confirmed plan included an agreement between the debtor and the State of Montana whereby the debtor would perform work for the State.  Post-confirmation, a dispute arose between the parties, and the debtor filed an action in bankruptcy court alleging a number of state law claims against the State.  The Ninth Circuit stated:

> Here, while the majority of the claims asserted in the complaint are common state tort and contract claims involving post-confirmation conduct, the Appellees also allege that: the State breached the Plan and the Zortman Agreement; the State breached the covenant of good faith and fair dealing with respect to these agreements; and the State committed fraud in the inducement at the time it entered into the Plan and the Zortman Agreement.  Among the remedies sought for these claims are disgorgement of the $1,050,000 paid to the State as part of the settlement and rescission of the Zortman Agreement.  Resolution of these claims will likely require interpretation of the Zortman Agreement and the Plan. *Compare Resorts Int'l*, 372 F.3d at 170 (no post-confirmation jurisdiction over accounting malpractice action where no need 'to interpret or construe the Plan or the incorporated Litigation Trust Agreement.').
>
> Moreover, these claims–and the attendant remedies sought–could affect the implementation and execution of the Plan itself, which specifically called for the creation of [a new company to perform the work for the State] and the transfer of debtor money to fund it.  We therefore conclude that these claims have a sufficiently 'close nexus' to the bankruptcy proceeding to uphold 'related to' jurisdiction over at least these three claims.
>
> The remaining claims have a much more tangential relationship to the underlying bankruptcy proceeding.  Nonetheless, the bankruptcy court could properly exercise supplemental jurisdiction over these claims.

*Id.* at 1194-95 (citation omitted).  In a footnote, the court stated: "We specifically note that in reaching this decision, we are not persuaded by the Appellees' argument that jurisdiction lies because the action could conceivably increase the recovery to the creditors.  As the other circuits have noted, such a rationale could endlessly stretch a bankruptcy court's jurisdiction." *Id.* at 1194 n.1 (citing, *inter alia*, *Resorts Int'l*, 372 F.3d at 170).

In this case, after the Bankruptcy Court had dismissed all of Uppal's claims for pre-confirmation conduct, the Bankruptcy Court correctly remanded Uppal's state court lawsuit. At that point, the only argument supporting "related to" jurisdiction would have been that resolution of the Uppal suit could conceivably increase the recovery to the creditors, who are still being paid according to the Plan. This rationale for post-confirmation "related to" jurisdiction was rejected by the Ninth Circuit in *Pegasus Gold Corp. See id.*

However, when Appellee returned to the Bankruptcy Court 12 weeks later, the situation had changed in three significant ways. First, Appellee had begun preparing an "Order to Show Cause re Contempt to recover the approximately $50,000.00 [Appellee] has expended on attorneys' fees and costs incurred by the [Appellee] dealing with, and defending against the Discharged Claims pursued and prosecuted by [Uppal]." (Appellants' ROA 5, Ex. A at 4.) Second, Uppal had "disclosed . . . [his] intention to seek to have the Confirmation Order vacated based upon the alleged fraudulent manner in which it was obtained." (*Id.*) Third, Appellants had argued for the first time "that Mr. Estrin has no authority to hire counsel on behalf of 350 Encinitas and, consequently, had no authority to pay any money for fees." (Appellants' ROA 14 ¶ 24, Ex. 23.) Although none of these three new legal claims/challenges were part of Uppal's state court litigation, the first two were explicitly referenced in the NOIA and/or the attached Settlement Agreement, and the third was implicit in the NOIA,[2] and was explicitly raised in the briefing and arguments addressing the NOIA.

Resolution of the third issue, Estrin's authority, required the Bankruptcy Court to interpret the Plan. The tentative ruling (which was incorporated by reference into the September 12, 2006 Order) states that the Bankruptcy Court "reviewed [the] terms of [the] confirmed plan of reorganization," "especially" section 5.6 (specifying Estrin's authority as

---

[2]  The concluding sentence of the NOIA states: "*The Responsible Person* has determined, in the exercise of his business judgment, that the terms of the [Settlement] Agreement, which terminate all proposed litigation in its entirety, is in the best economic interest of the Reorganized Debtor and the estate." (Appellants' ROA 5 (emphasis added).) Implicit in this statement is that the opinion of the Responsible Person (i.e., Estrin) is relevant–that is, that he is authorized to enter into the Settlement Agreement on behalf of Appellee.

the "Post-Effective Date Responsible Person and Disbursing Agent for the Estate") and sections 5.7-5.8 (specifying the post-confirmation authority retained by the "Debtor"). (Appellee's ROA 1.41.)  Because resolution of the issue of Estrin's authority required the Bankruptcy Court to interpret the Plan, there existed "related to" jurisdiction.  *See In re Pegasus Gold Corp.*, 394 F.3d at 1194 (finding that "related to" jurisdiction existed because, *inter alia*, "[r]esolution of the[] claims will likely require interpretation of . . . the Plan"); *compare Resorts Int'l*, 372 F.3d at 170 (finding no post-confirmation jurisdiction over accounting malpractice action where there was no need "to interpret or construe the Plan or the incorporated Litigation Trust Agreement").

In performing the action requested in the NOIA (i.e., approving the settlement), it was also necessary for the Bankruptcy Court to examine and evaluate the claims being settled.  *See In re A & C Properties*, 784 F.2d 1377, 1381, 1383 (9th Cir. 1986) (in approving a settlement, a bankruptcy court must make "a full and fair independent assessment of the wisdom of the compromise," including "[t]he probability of success in the litigation").  Therefore, the NOIA required the Bankruptcy Court to consider the likelihood of success of the proposed contempt action and Uppal's threatened challenge of the confirmation order.  The Bankruptcy Court would have core jurisdiction over either of those actions.  *See, e.g.*, *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 284-85 (9th Cir. 1996) ("Congress gave bankruptcy courts the power of contempt through [Bankruptcy] Rule 9020" and bankruptcy courts also have inherent powers to sanction); *In re California Litfunding*, 360 B.R. 310, 312 (Bankr. C.D. Cal. 2007) (bankruptcy court has core jurisdiction over action collaterally attacking confirmation order and seeking contempt sanctions); *cf.* 11 U.S.C. § 1144 (providing for revocation of an order of confirmation within 180 days if the order was procured by fraud).

Appellee did not attempt to again remove the Uppal litigation from state court.[3]  If that

---

[3] Instead, the Bankruptcy Court ruled that "Debtor is authorized to pursue settlement by obtaining state court determination that this is a good faith settlement between the debtor and Uppal, et al." (Appellee ROA 1.41.)  The Settlement Agreement requires, as a "condition to finality of this settlement," that the state court enter an order "approving the compromise embodied in this Agreement as a Good Faith Settlement based on the Plaintiffs' motion made pursuant to California Code of Civil Procedure § 877.6.  (Appellants' ROA 5, Ex. A at 6.)

had been done, the jurisdictional focus might have been solely on the remaining claims in the litigation at the time of removal–all involving post-confirmation conduct. Instead, the matter brought before the Bankruptcy Court was the settlement of all of the claims addressed in the Settlement Agreement attached to the NOIA. This places the focus on all of the claims being settled. *See In re A & C Properties*, 784 F.2d at 1383 (a court must consider the probability of success of the claims being settled); *see also* Bankr. Rule 9019 ("after notice and a hearing, the court may approve a compromise or settlement"). The Bankruptcy Court had core jurisdiction over two of those claims–the contempt action and the challenge to the confirmation order. Therefore, the Court finds that in addition to "related to" jurisdiction, the Bankruptcy Court had core jurisdiction over the NOIA.[4]

**B. Estrin's Authority**

Appellants challenge the following ruling by the Bankruptcy Court:

> Estrin has authority to request this court authorize the settlement. The history of the negotiation of this ultimately consensual plan makes it clear that Estrin was to succeed Barry Stone and Gas Plus in management of the debtor until plan terms had been performed. Given Estrin's extensive participation in the litigation with Uppal–all without protest by Stone/Gas Plus–even if the full extent of Estrin's authority was not entirely clear, Stone/Gas Plus' post-confirmation conduct waives any claim that he is without authority to settle the litigation.

(Appellee ROA 1.41.)

This Court "review[s] the bankruptcy court's findings of fact under the 'clearly erroneous' standard and its conclusions of law de novo." *In re A & C Properties*, 784 F.2d at 1380 (citation omitted).

The record amply supports the finding of fact by the Bankruptcy Court that "[t]he history of the negotiation of this ultimately consensual plan makes it clear that Estrin was to

---

[4] It is worth noting that "the distinction between core and non-core jurisdiction may not be particularly relevant after confirmation." *In re Gen. Media, Inc.*, 335 B.R. 66, 74 (Bankr. S.D.N.Y. 2005) ("Although the cases generally focus on 'related to' post-confirmation jurisdiction, the scope of the post-confirmation jurisdiction mapped out by the case law usually meets the definition of a core proceeding. Broadly speaking, the proceeding must affect some aspect of the plan–its meaning, its implementation or its consummation–to come within the Court's post-confirmation jurisdiction. By definition, plan-related matters arise only in the context of a chapter 11 bankruptcy case. But even if the proceeding is core, its outcome must still affect the Plan.") (citation omitted).

succeed Barry Stone and Gas Plus in management of the debtor until plan terms had been performed." (Appellee ROA 1.41.) According to a declaration by the director of the largest unsecured creditor, The Melvin Garb Foundation ("MGF"):

> MGF had completely lost confidence in the Debtor, its managing member Gas Plus, Inc., generally, and in particular Barry J. Stone, the President of Gas Plus. As a result, MGF absolutely would not consent to any proposed plan that called for payment of its claim over time and left Barry Stone and/or Gas Plus . . . with any powers of management or control of the Reorganized Debtor's assets during the payout period.

(Appellants' ROA 12 at 1-2.) The Plan disclosure statement provides: "The Responsible Person [i.e., Estrin] may retain outside professionals, including the continuing services of . . . Debtor's counsel in this case, to continue pursuit of all post-confirmation matters." (*Id.* at 2; Appellee's ROA 1.21 at 14.) Under the original version of the Chapter 11 plan proposed by Appellants, Appellant Barry Stone was designated as the "Responsible Person" (Appellee ROA 1.3 at 7); the Plan was opposed by the MGF and ultimately was "disapproved" by the Bankruptcy Court. (Appellee's ROA 1.6 & 1.9.) Under the confirmed Plan, Estrin is designated as the "Responsible Person" (Appellants' ROA 2, Ex. A at 4.)

The Plan provides that the "Debtor," apparently meaning Appellants,[5] shall be responsible for litigating specified claims not relevant to the claims and threatened claims at issue in the Settlement Agreement.[6] (Appellants' ROA 2, Ex. A at 3, 21 (providing that the Debtor may litigate "all rights exercisable by the Debtor as Debtor-in-Possession pursuant to Bankruptcy Code Sections 506, 510, 544, 547, 548, 549, 550 and 553"[7] and "any objections to Claims").) The Court concludes that the Plan reserves for the "Responsible Person" the right to litigate and/or settle all claims other than those specifically designated for the "Debtor." "'Responsible Person' means . . . Edward Z. Estrin, CPA, or such other person as

---

[5] Appellant Barry Stone signed the Plan on behalf of Debtor, "350 Encinitas Investments, LLC." (Appellants' ROA 2, Ex. A at 27.)

[6] The Plan provides that "[i]n carrying out its responsibilities under this Plan, the Debtor shall be entitled to employ such counsel . . . as may be necessary . . . to assist it in the performance of its duties under the Plan." (*Id.*, Ex. A at 20.)

[7] *See* page 2, footnote 1, *supra*.

the Bankruptcy Court shall appoint to be *responsible for the Debtor's performance under the Plan from and after the Confirmation Date*." (*Id.*, Ex. A at 7 (emphasis added).) The "Debtor's performance under the Plan" could include settling actions that would, in the words of the NOIA, "continue to be a drain on the estate." (Appellants' ROA 5.)

Based upon the language of the Plan, and the course of conduct of the parties during Plan negotiation and after Plan confirmation, this Court concludes that the Bankruptcy Court correctly concluded that "Estrin has authority to request this court authorize the settlement." (Appellee ROA 1.41.)

But even if Estrin lacked actual authority to enter into the Settlement Agreement, the record supports the Bankruptcy Court's finding that Appellants' post-confirmation conduct waives any claim that Estrin is without authority to settle the litigation.

"Waiver occurs when there is an existing right, a knowledge of its existence, and an actual intention to relinquish it, or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *U.S. v. Reliance Ins. Co.*, 799 F.2d 1382, 1387 (9th Cir. 1986) (citation and internal quotations omitted); *see also In re County of Orange*, 219 B.R. 543, 563 (Bankr. C.D. Cal. 1997). "The determination of whether there is a waiver is usually a question of fact as the question of intent 'necessarily depends on the factual circumstances of each case.'" *In re County of Orange*, 219 B.R. at 563 (quoting *Sessions, Inc. v. Morton*, 491 F.2d 854, 858 (9th Cir. 1974); citing *CBS, Inc. v. Merrick*, 716 F.2d 1292, 1295 (9th Cir. 1983) ("[T]he existence of a waiver is usually a fact question.")).

Assuming Appellants possessed the right to hire and direct counsel on behalf of Appellee after confirmation of the Plan, then Appellants must be charged with knowing of this right. Appellants raised the argument that only Appellants, and not Estrin, have the authority to hire and direct counsel to bind Appellee. Moreover, Appellants have been involved in all stages of the Plan's formation: Appellants managed 350 Encinitas Investments prior to and after the filing of the Petition, were involved in all of the proceedings leading up to the confirmation of the Plan, and signed the Plan on behalf of 350 Encinitas Investments.

The final element of waiver is whether Appellants acted with "actual intention to

relinquish [the right], or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *Reliance Ins. Co.*, 799 F.2d at 1387.

In January of 2005, Appellants, through their attorneys, sent letters to Estrin demanding that Estrin make an election on behalf of Appellee to participate in the California Tax Amnesty Program. (Appellants' ROA 13 at 2.) If Appellants possessed the right of managerial authority over Appellee and wished to enforce that right, presumably they would have made the election for Appellee themselves. By not doing so, and instead asking Estrin to do it for Appellee, they evidenced "conduct . . . inconsistent with the intent to enforce the right." *Reliance Ins. Co.*, 799 F.2d at 1387.

On October 10, 2005, Appellant Barry Stone and his counsel participated in a mediation concerning Uppal's claims. (Appellants' ROA 14 at 2.) Also participating was attorney Keehn, who was hired by Estrin and who entered his appearance on behalf of Appellee. (*Id.*) At no time during the mediation did Appellant Stone, his counsel, or anyone else, object to Keehn's appearance on behalf of Appellee; nor did anyone suggest that Estrin lacked authority to engage and direct counsel on behalf of Appellee. (*Id.*)

On November 4, 2005, Keehn, acting as counsel for Appellee, removed Uppal's complaint to Bankruptcy Court. (Appellants' ROA 3.) On November 10, 2005, Appellants' counsel contacted Keehn to discuss defense strategies. (Appellants' ROA 14, Ex. 6.) On November 25, 2005, Keehn, acting as counsel for Appellee, filed a motion to dismiss Uppal's complaint. (Appellee's ROA 2.5.)

On December 5, 2005, Appellants, through counsel, filed a "Joinder in Defendant 350 Encinitas Investments, LLC's Motion to Dismiss Complaint." (Appellee's ROA 2.8.) Appellants again failed to object to the authority of Keehn, whom they knew to have been hired by Estrin, to act on behalf of Appellee. By joining in Keehn's motion to dismiss while continuing to fail to object to his authority, they evidenced "conduct so inconsistent with the intent to enforce the right [to hire and direct counsel for Appellee] as to induce a reasonable belief that it has been relinquished." *Reliance Ins. Co.*, 799 F.2d at 1387.

On April 21, 2006, after the Bankruptcy Court dismissed some of Uppal's claims and

remanded the rest to state court, Estrin (who was representing himself in the Uppal litigation), Keehn and Appellants' attorney conferred regarding the "walk-away settlement" proposed by Uppal's attorney. (Appellants' ROA 13 at 5-6.) Appellants' attorney did not suggest that Estrin or the attorney hired by him did not have the authority to settle the claims on behalf of Appellee.

On April 24, 2006, Appellants' attorney wrote to Appellee's attorney communicating Appellants' position that Appellee should not give up any right to recover attorneys fees against Uppal. (Appellants' ROA 14 ¶ 21, Ex. 20.) Again, Appellants' attorney did not suggest that Estrin or the attorney hired by him did not have the authority to settle the claims on behalf of Appellee. Two weeks later, Appellants finally raised the argument that Estrin did not possess managerial authority over Appellee and was not empowered to enter into a settlement on behalf of Appellee.

For over a year, including six months of litigation activity related to Uppal's claims, Appellants acted in a manner "so inconsistent with the intent to enforce the right [to manage, direct and hire counsel on behalf of Appellee] as to induce a reasonable belief that it has been relinquished." *Reliance Ins. Co.*, 799 F.2d at 1387. This Court affirms the Bankruptcy Court's finding that "Given Estrin's extensive participation in the litigation with Uppal–all without protest by Stone/Gas Plus–even if the full extent of Estrin's authority was not entirely clear, Stone/Gas Plus' post-confirmation conduct waives any claim that he is without authority to settle the litigation."[8] (Appellee's ROA 1.41.)

**C. Approval of the Settlement Agreement**

"[T]he bankruptcy court's order approving the trustee's application to compromise the controversy is reviewed for an abuse of discretion." *In re A & C Properties*, 784 F.2d 1377, 1380 (9th Cir. 1986) (citations omitted). Reversal for abuse of discretion is not appropriate unless the Court has a "definite and firm conviction" that the court below "committed a clear

---

[8] Even if there were only "related to" jurisdiction, and core jurisdiction did not exist over this matter, this Court would overrule Appellants' objections and adopt the Bankruptcy Court's findings of fact and conclusions of law, and would supplement those findings as set out in this Order. *See* 28 U.S.C. § 157(c)(1).

error of judgment." *Marchand v. Mercy Medical Center*, 22 F.3d 933, 936 (9th Cir. 1994). However, "[a]n exercise of discretion based on an erroneous interpretation of the law can be freely overturned." *In re Arden*, 176 F.3d 1226, 1228 (9th Cir. 1999) (quotation omitted).

The Bankruptcy Court stated: "The tentative [ruling] . . . will be approved or confirmed as a final ruling . . . . [T]he Court has looked at the Plan, has looked at the rationale for the litigation, tested it against *A[&]C Properties*, and believes that this settlement is in the best interest of the estate and its creditors and subsequently I will authorize it." (Supplement to Transmittal of Appeal, Doc. # 9 at 19-20; *see also* Appellee's ROA 1.42 (incorporating by reference the Bankruptcy Court's findings of fact and conclusions of law stated at oral argument).)

According to *A & C Properties*, in deciding whether to approve a compromise agreement, a bankruptcy court must consider whether there has been a good faith negotiation of a settlement and whether the compromise is "fair and equitable." *A & C Properties*, 784 F.2d at 1381. The Ninth Circuit has instructed:

> In determining the fairness, reasonableness, and adequacy of a proposed settlement agreement, the court must consider: (a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in collection; (c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* (citation omitted).

Appellants argue that the Bankruptcy Court's findings of fact and conclusions of law were "patently deficient (in truth, absent)," under the rules set forth in the *A & C Properties* decision. (Appellants' Reply Br., Doc. # 20, at 7.)

In *A & C Properties*, the Ninth Circuit considered an objection that the bankruptcy court's findings of fact and conclusions of law were "'boiler plate,' and as such [we]re defective." *A & C Properties*, 784 F.2d at 1382. The Ninth Circuit stated:

> In our case, the bankruptcy court's findings of fact and conclusions of law are rather general. However, the bankruptcy court attached to these findings and conclusions a copy of the settlement agreement upon which it relied, and which it approved. The settlement agreement, which is twenty-five pages in length, sets forth in detail the claims which it purports to settle, the parties involved, the valuation of the corporate assets, the identity of shareholders and the number of

> outstanding shares, the cost-benefit analysis of the relative merits of pursuing or settling the various claims, and the conditions which would enable the trustee to proceed with the liquidation.  Appellate review is made more difficult by the lower court's failure to write an opinion explaining why it deemed the compromise to be fair, reasonable and adequate.  However, where the record supports approval of the compromise, the bankruptcy court should be affirmed.

*Id.* at 1383 (citation omitted).

Similar to the situation in *A & C Properties*, the Bankruptcy Court "fail[ed] to write an opinion explaining why it deemed the compromise to be fair, reasonable and adequate."  *Id.* But, as in *A & C Properties*, the Bankruptcy Court attached a copy of the Settlement Agreement to the September 12, 2006 Order.  The 18-page Settlement Agreement details the facts surrounding the settlement and the positions of the settling parties.  The Bankruptcy Court received briefing and evidence from the parties (including three declarations and numerous attached exhibits supporting the compromise) and heard oral argument on the issue. Moreover, the Bankruptcy Court who approved the compromise handled the underlying bankruptcy case, confirmed the Plan, and presided over Uppal's lawsuit when it was removed from state court.  *See A & C Properties*, 784 F.2d at 1383 (stating that "the bankruptcy judge was informed and had apprised himself of all facts necessary to make an intelligent and independent judgment that the compromise was fair and equitable," in part because "[t]he litigation was filed in the bankruptcy court in 1976, and the judge who approved the compromise had handled the matter since 1980.").  This Court finds that, in accordance with *A & C Properties*, despite the Bankruptcy Court's brief findings, if "the record supports approval of the compromise, the bankruptcy court should be affirmed."  *Id.* (citation omitted).

The first of the four *A & C Properties* "fairness" factors is "[t]he probability of success in the litigation."  *Id.* at 1381.  The Bankruptcy Court's order dismissing Uppal's pre-confirmation claims is no longer subject to appellate review, cutting off any collateral attack on the findings of fact contained therein.  Thus, there is a high probability of success of a contempt motion.[9]

---

[9]  Although success would not be guaranteed.  For instance, it is possible that in order to prove damages in the contempt proceeding (consisting of Keehn's attorney fees), Appellee would have to overcome the argument that Estrin did not have the authority to hire and pay

Because Uppal's state court litigation was in the early discovery stages, it is difficult to assess the probability of Uppal succeeding in the lawsuit. It is worth noting that after review of Uppal's state court complaint, dismissal of the entire complaint via a motion to dismiss appears unlikely. (Appellee's ROA 2.1.) Therefore, Uppal's suit likely would proceed into full discovery, causing a drain on the resources of Appellee, as considered below with respect to the third "fairness" factor.

It is likewise difficult to assess the probability of Uppal succeeding in challenging the confirmation of the Plan due to lack of notice and fraud. However, in most instances, there is a strict 180-day time limit for actions seeking to revoke a plan confirmation for fraud. *See* 11 U.S.C. § 1144 (providing for revocation of an order of confirmation within 180 days if the order was procured by fraud); *but see In The Matter of Newport Harbor Associates*, 589 F.2d 20, 24 (1st Cir. 1978) (providing for a limited avenue of relief other than § 1144 for "creditors who may have been injured by fraud"); *In re Circle K Corp.*, 181 B.R. 457, 460-62 (Bankr. D. Ariz. 1995) (applying rule of *Newport Harbor Associates*); *cf. In re Maya Constr. Co.*, 78 F.3d 1395, 1399 (9th Cir. 1996) ("Generally, if a known contingent creditor is not given formal notice, he is not bound by an order discharging the bankruptcy's obligations. The fact that a creditor has actual knowledge that a Chapter 11 bankruptcy proceeding is going forward involving a debtor does not obviate the need for notice."). Therefore, the Court assumes *arguendo* that the likelihood of Uppal succeeding in revoking the Plan would be low.

On balance, the Court finds that the first "fairness" factor weighs against the compromise.

The second "fairness" factor is "the difficulties, if any, to be encountered in collection." *A & C Properties*, 784 F.2d at 1381. According to the record, after Plan confirmation, "Uppal did not regularly perform his monetary obligations to the Reorganized Debtor as they came due. Specifically, . . . Uppal was always late on his payments and would send in 3, 4, or 5 post dated checks to pay the rent often 1-2 months late. He failed to make some payments until the

---

Keehn on behalf of Appellee.

sale when he brought the entire balance, including late charges, current based on [Estrin's] demand in escrow." (Appellants' ROA 13 at 2.) Based upon this evidence of Uppal's delinquent performance of his past obligations to Appellee, the Court finds that the second factor favors settlement.

The third "fairness" factor is "the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it." *A & C Properties*, 784 F.2d at 1381. Due to the removal to the Bankruptcy Court and subsequent remand, the state court litigation was in the early stages of discovery. A review of the state court complaint, as well as of the proceedings before the Bankruptcy Court, indicates that there likely would be significant expense, inconvenience and delay to the Appellee in defending against Uppal's state court claims. Additionally, there likely would be simultaneous proceedings in the Bankruptcy Court, involving the contempt action and the challenge to the Plan confirmation. The Court finds that the third factor favors settlement.

The final "fairness" factor is "the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Id.* The largest unsecured creditor, MGF, submitted a declaration in support of the NOIA. Despite being noticed, no other creditor opposed the NOIA. As the Plan is still being performed, the "paramount interest of the creditors" presumably is to be paid. Protracted litigation against Uppal likely would divert significant amounts of Appellee's funds toward litigation costs. The litigation costs would not only include attorneys' fees for Appellee, but might include additional attorneys' fees for Estrin.[10] The Court finds that this factor favors settlement.

On balance, the Court finds that the *A & C Properties* factors weigh in favor of the

---

[10] According to Estrin's declaration:

> Up to this point I have been representing myself in the State Court Action, and have incurred no attorneys fees. However, that litigation has progressed to the point that I am no longer comfortable doing that. If that action proceeds, then I will need to hire an attorney to represent my interests in that case. Since the claims all arose from the performance of my duties as the Reorganized Debtor's Responsible Person, I will be seeking indemnity for those expenses from the reorganized Debtor to the fullest extent possible.

(Appellants' ROA 13 at 6.)

settlement approved by the Bankruptcy Court.

Appellants argue that the approval of the settlement should not be affirmed because the settlement exculpates Estrin for his misconduct, as alleged in Uppal's state court complaint. However, the Court finds that this is not a significant consideration in the determination of whether the settlement should be approved by Appellee. Even if Estrin exceeded his authority as Responsible Person under the Plan and this meant that only Estrin and not the Appellee was found to be liable to Uppal, this fact would not alter the Court's analysis of the *A & C Properties* factors. As discussed above, the Court assumed that with respect to Appellee, the first "fairness" factor–probability of success in the litigation–weighs against the compromise.

Appellants also object that the NOIA seeking approval of the Settlement Agreement did not provide notice as required by bankruptcy rules. Specifically, Appellants argue that "the State of California, a priority tax claimant, was given no notice whatsoever of this Settlement Agreement." (Appellants' Reply Br., Doc. # 20, at 8.) The record, however, does not support this contention. The proof of service attached to the NOIA lists 32 names and addresses, including the State of California's Franchise Tax Board, which is responsible for administering California's Corporation and Personal Income Tax programs. (Appellants' ROA 5.)

Finally, the Court notes that there is no evidence in the record indicating that the settlement was not negotiated in good faith.

The record supports the approval of the compromise and the Court finds that the Bankruptcy Court did not abuse its discretion.

Therefore, this Court affirms (1) the Bankruptcy Court's finding that the settlement is in the best interest of the estate and its creditors, and (2) the September 12, 2006 Order authorizing Appellee to consummate the settlement.[11] (Supplement to Transmittal of Appeal, Doc. # 9 at 19-20; Appellee's ROA 1.42.)

---

[11] Even if there were only "related to" jurisdiction, and core jurisdiction did not exist over this matter, this Court would overrule Appellants' objections and adopt the Bankruptcy Court's findings of fact and conclusions of law, and would supplement those findings as set out in this Order. *See* 28 U.S.C. §157(c)(1).

**III. Conclusion**

For the foregoing reasons, this Court **AFFIRMS** the Bankruptcy Court's September 12, 2006 Order. The Clerk of the Court shall enter Judgment in favor of Appellee and against Appellants.

DATED: September 6, 2007

**WILLIAM Q. HAYES**
United States District Judge